**In re Samuel SHAHEEN, Debtor.**

**No. 01–11680–RGM.**

United States Bankruptcy Court,
E.D. Virginia,
Alexandria Division.

June 12, 2001.

**456**

Joel Steinberg, Alexandria, VA, for Debtor.

George R. Leach, Williamsburg, VA, for Kevin Penrose.

### MEMORANDUM OPINION

ROBERT G. MAYER, Bankruptcy Judge.

THIS CASE was before the court on May 16, 2001, and June 6, 2001, on the motion of Kevin Penrose for an order directing that funds being held subject to a pre-petition garnishment be paid over to the chapter 13 trustee, the motion of the debtor for an extension of time to file a chapter 13 plan and Schedules I and J, and the trustee's motion to dismiss this case. The court entered a Preliminary Order on May 17, 2001, which made certain findings of fact and conclusions of law. The issue of whether the case should be dismissed with prejudice was left open from the May 16, 2001, hearing and set to be heard on June 6, 2001. At the commencement of the June 6, 2001, hearing, the debtor requested that the Preliminary Order and the findings of fact and conclusions of law contained therein be reconsidered. Upon consideration of the debtor's motion, the court will vacate the Preliminary Order and reconsider the findings of fact and conclusions of law.

The debtor was present in person and represented by his attorney, Joel Steinberg. Kevin Penrose was not present in person but was represented by his attorney, George R. Leach. Gerald M. O'Donnell, the chapter 13 trustee, was present in person. Upon consideration of the testimony of the debtor and John Davis LaBelle, the debtor's witness, the exhibits and the argument of counsel, the court makes the following findings of facts and conclusions of law:

### FINDINGS OF FACT

1. The debtor's petition, schedules, and Statement of Financial Affairs are materi-

ally in error. The petition requires the debtor to disclose prior petitions filed within six years. The debtor did not disclose a chapter 13 petition filed in 1996 in Newport News, Virginia, Case No. 96–40314–DHA, which was dismissed with prejudice.

2. The debtor scheduled real property on Schedule A with a value of $292,600.00. The property was a new home purchased from the builder. It was purchased on February 28, 2001, for a total purchase price of $493,278.00. The debtor borrowed $345,200.00, which was secured by a first trust on the property and about $100,000.00 which was secured by a second trust on the property. (Ex. 2). The debtor scheduled two trusts encumbering the property which, he states, aggregate $443,800.00. The debtor paid $39,133.18 at closing on February 28, 2001, and had paid a deposit of $15,000.00, for a total of $54,133.18. (Ex. 2). The fair market value of the real property as of April 13, 2001, the day that the schedules were signed and the petition filed, was $493,278.00. The debtor has equity in the property as of April 13, 2001, of approximately $50,000.00.

3. Schedule B is inaccurate. The debtor did not schedule JDSU stock or Spider Unit Trust, a mutual fund. He testified on May 16, 2001, that he owned 420 shares of JDSU Stock, which he purchased at $68.00 per share, and which has a current market value of $19.00 per share. He also stated that he sold the Spider Unit Trust after filing the petition in this case. He testified on June 6, 2001, that the brokerage account was a part of his First Union Cap Account and that the combined value of the Cap Account as of April 13, 2001, was about $16,000.00. The debtor scheduled two First Union checking accounts on Schedule B. One was scheduled with a balance of $0.00, the other with a balance of $2,000.00.

4. Schedule E is inaccurate. The debtor did not list a debt due to the Internal Revenue Service for income taxes due for calendar year 1999 in the amount of $6,000.00 or a debt due to the Internal Revenue Service for taxes due for calendar year 2000 in the amount of $33,000.00. The debtor was aware of both obligations at the time of the filing. The debtor carefully listed separate obligations to the Internal Revenue Service for each calendar year from 1993 through 1998. Each was listed in the exact amount contained on notices from the IRS dated March 12, 2001. (Ex. 5). The debtor was on a payment plan with the IRS for all obligations due to the IRS except the 1999 and 2000 obligations. The payment was $500.00 per month and was current at the time of the filing of the petition.

5. The original Schedule F is incomplete. The debtor did not schedule a debt to his fiancee. The debtor borrowed the money around February 2001. The debtor subsequently amended his schedules to reflect the debt.

6. The Statement of Financial Affairs is incorrect. The answer to Question 3, which requests payments to creditors, does not include First Union Brokerage, which was paid over $30,000.00 during the period from January to April 2001, according to the debtor's testimony on May 16, 2001. The debtor owed the brokerage firm $1,300.00 as of the petition date. The debtor testified that First Union Brokerage made margin calls on the debtor's stock market investments from January through April 2001. In many of the instances, the brokerage firm realized on its collateral by selling the stock in the account pursuant to its security interest.

The debtor also did not list his employer, Fairfield Communities, Inc. Penrose served a garnishment on the debtor's bank account at Burke & Herbert Bank. Not

knowing of the garnishment or not being aware that any additional deposits would be captured by the garnishment, the debtor deposited his paycheck into the account. Fairfield issued a second paycheck to cover the frozen funds. It was treated by Fairfield as a company advance. (Ex. 8). The garnishments were issued against both Fairfield and Burke & Herbert between February 28, 2001, and March 14, 2001.[1] Fairfield took the debtor's entire net paychecks for March 30, 2001, April 13, 2001, and April 22, 2001, in partial repayment of the company advance. The first payment in the amount of $1,039.12 was made pre-petition. The second payment in the amount of $998.30 was made on the day the petition was filed. The third payment in the amount of $1,152.80 was made post-petition. As of the date the schedules were signed and filed, Fairfield was a creditor and had been paid more than $600.00 within 90 days immediately prior to the commencement of this case.

To the extent any payment from Fairfield or the brokerage firm was a set off, Question 13 was incomplete.

7. The debtor had an excellent estimate of his annual income and the amount of money from his income that would be available for his chapter 13 plan on the day he filed his petition. His adjusted gross income for federal income tax purposes for 1998 was $119,387.[2] (Ex. 5, page 8). His gross income for 1999 was $117,611.00 and for 2000 was $326,000.00, information that the debtor included on his Statement of

Affairs signed on April 13, 2001, and filed with the petition the same day. In addition, before filing the petition, he had completed, in draft, Schedule I, Statement of Income. (Ex. 6). This projected his income at $12,500.00 per month, or $150,000.00 per year. Both the debtor and his immediate supervisor, John Davis LaBelle, testified that after having earned an extraordinary amount in 2000, Fairfield changed the debtor's compensation package so that he would earn between $140,000 and $170,000 per year.

The debtor received pay stubs with his paychecks twice a month. The pay stubs clearly itemize all deductions from his gross income. (Ex. 7). The four pre-garnishment pay stubs for 2001 reflect identical deductions for medical, dental and disability insurance totaling $445.28 per month. There were no deductions for federal or state income taxes. (Ex. 7). After the garnishment was served, the tax withholdings were substantially changed, the federal increased to 40% of federal taxable gross income, and the state to 20%. The tax deductions were changed once again, this time on the first paycheck after the filing of the petition. The tax withholdings were reduced to 13% of the federal taxable gross income, and the state to 7%. The maximum Virginia income tax rate is 5.75%. The Virginia income tax withheld from the debtor's March 14, 2001, paycheck was $1,898.09. The total Virginia income tax due at the highest rate without considering any tax deductions [3]

---

1. The pay stub for the pay period ending February 28, 2001, reflects no deduction for a garnishment while the pay stub for the pay period ending March 14, 2001, reflects a deduction of $801.95 for a garnishment. (Ex. 7).

2. The debtor only introduced page 2 of his 1998 federal tax return. The gross income, and its sources, is not known.

3. The debtor is entitled to tax deductions. He has a home mortgage interest deduction on two trusts with a total principal of about $443,800.00, real estate taxes on a house worth almost $500,000.00 and monthly business expenses of $2,500.00. His itemized deduction in 1998, without an interest or real estate tax deduction, was $50,863.00. He

would have been $1,685.55. As of April 22, 2001, the debtor had overwithheld his Virginia income tax by at least $2,212.58 and continues to have more withheld than necessary.

The debtor estimated his net income on his draft Schedule I at $9,765.00, although this contains an obvious mathematical error. The correct amount, using the debtor's figures, is $8,198. This should be adjusted to $8,330.00 if the actual insurance deductions as shown on the pay stubs are used.[4]

The debtor knew what his expenses were on the day he filed his petition. He had prepared a draft Schedule J before filing bankruptcy. The expenses are reasonable and basically fixed. There is not a great deal that the debtor could do to reduce most of the expenses in any significant amount. The debtor testified that he could reduce a $647.00 monthly transportation expense. This expense reflects the costs of visiting his children monthly. They live with their mother in Florida. He also listed a business expense of $2,500.00. He testified that this was necessary because of his position at Fairfield. He is not a salesman, but rather a manager. The $2,500.00 monthly expense is for the salesmen working under him and from whom he derives his income. Without this expense, which he says is significantly lower than in previous years, he will not be able to properly motivate his salesmen and will lose income. The expenses, with the business expense, total $9,483.00. He testified that he had discussed his expenses with his counsel and was advised that they had to be cut.

With the information he had on the day he filed his petition, he could have timely completed Schedules I and J without an extension of time.[5]

8. The debtor received a notice of assessment from the Internal Revenue Service before filing bankruptcy and knew the amount of the IRS claim prior to the filing of the petition in bankruptcy. The question of whether the taxes reflected on the notice of assessment are unsecured priority claims or general unsecured claims is a legal question that could have been answered when the petition was filed. The debtor's priority taxes are about $67,000.00; his unsecured non-priority taxes, about $52,000.00; his non-dischargeable non-priority claims, about $82,000.00; and his unsecured non-priority claims, about $17,750.00.

9. The debtor made no voluntary payments since at least 1996 on the debt owed to Kevin Penrose and determined by the United States Bankruptcy Court for the Eastern District Virginia, Newport News Division, to be non-dischargeable in a prior bankruptcy filing. While the debtor testified to some incidental voluntary payments before 1996, the court finds them inconsequential. The only significant payments were obtained by garnishment of a civil judgment and a restitution order in a criminal case. The restitution payment was part of a plea agreement that avoided a finding of guilt in a criminal trial.

---

also testified that he lost a lot of money in the stock market in 2001.

4. The debtor estimated social security, medicare and federal and state income tax deductions at 30% of his gross income on his draft Schedule I. This is lower than the 40% federal and 20% state deductions he had taken out of several of his recent paychecks. In light of

his anticipated tax deductions, a 30% allowance for taxes is likely to be the minimal amount necessary to be deducted from his wages. In fact, the actual amount may end up higher.

5. The schedules are due 15 days after filing the petition.

10. During calendar year 2000, the debtor's income increased by more than $200,000.00. The entire increase was available to pay the debtor's creditors. The debtor, instead of paying his creditors, sought to benefit himself by investing the additional income in the stock market and by purchasing an expensive home. He invested $60,000.00 in the stock market and made a down payment on his home in the amount of $50,000.00. He had a sufficient amount of money in 2000 to pay either (and probably both) of his two principle creditors, the Internal Revenue Service and Kevin Penrose, in full. During this entire time, the IRS was on a payment schedule. The payments were deducted directly from the debtor's paycheck.

11. The debtor's income for calendar year 2001 is targeted between $140,000.00 and $170,000.00.

12. The debtor purchased an expensive home in February 2001, and owns a luxury automobile, a Mercedes Benz. In 2000, he took combination business and vacation trips to Los Vegas, Atlantic City and other resorts. He gambled and lost money, at least $3,000.00.

13. The debtor testified that the errors on the petition, schedules and Statement of Financial Affairs were not his fault but rather the fault of his lawyers. He further testified that he did not read the petition, schedules or Statement of Financial Affairs before he signed them under oath, but only glanced at them. The court finds that the debtor's conduct was deliberate and not merely reckless.

14. The debtor had the ability to timely file a chapter 13 plan and Schedules I and J but knowingly chose not to do so. Delay has resulted from his failure to act. The delay is unreasonable and is prejudicial to creditors.

15. The debtor intended to hinder and delay his creditors by deliberately filing an incomplete and erroneous petition, schedule and Statement of Financial Affairs and by failing to timely file a chapter 13 plan and Schedules I and J.

16. The debtor has failed to make any payment to the trustee.

17. The debtor seeks the recovery of the garnished funds in the amount of $16,000.00, which he intends to use for personal expenses and not devote to payment of creditors.

### CONCLUSIONS OF LAW

The debtor was in a position to timely file complete and accurate schedules and a complete and accurate Statement of Financial Affairs. In order to have filed the petition under chapter 13 in good faith, he must have reviewed his income and expenses to be assured that a chapter 13 plan could be filed in good faith, that is, that his income exceeded his expenses. With no net disposable income, no chapter 13 plan could be confirmed in this case. After costs of sale, the expensive home the debtor purchased in February 2001, would probably not realize sufficient funds to constitute, standing on its own, a good faith plan. There are no other assets that could be liquidated. Consequently, monthly payments to the chapter 13 trustee would be required. A chapter 13 plan must, at a minimum, pay in full all priority claims. In this case, the priority tax claims and the trustee's commission and expenses require $72,043.00 in payments to the chapter 13 trustee over the course of the chapter 13 plan. The maximum plan length is 60 months, which results in monthly payments of $1,200.00. The debtor's income after taxes and insurance is $8,330.00 per month. His monthly expenses are $9,483.00. In order for this minimal plan to work, he would have to

increase his after-tax income or reduce his expenses by $2,353.00 a month. This he cannot achieve.

It is doubtful that a minimal plan would be approved in any event. The debtor earned $200,000.00 more in 2000 than he had ever earned before. Forty-five days before he filed bankruptcy he spent $50,000 on a new, expensive home, effectively putting the bulk of the downpayment beyond the reach of his creditors. It is unlikely that much of the deposit can be recovered at this time if the house were to be sold. The costs of sale would likely consume much, but not all, of the equity. He invested in the stock market at a time when he could have paid his creditors in full. He did not pay his income taxes in full. The bulk of the priority claim arises from 2000. The effect of a minimal chapter 13 plan would be to saddle the creditors with the results of the debtor's investment choices.

A minimal plan would also be doubtful because it would pay nothing to Penrose. The debtor assaulted Penrose. Penrose had carried on an affair with the debtor's wife for five years although the debtor's testimony was unclear whether that was before or after he and his wife separated. The debtor has consistently sought to avoid paying Penrose the judgment. He testified that he paid all other creditors except Penrose and was on an agreed payment plan with the IRS. His prior bankruptcy was an attempt to avoid payment of the judgment. It was filed after the debtor was served with an interrogatories summons. While he testified that he had recently offered to settle the judgment, the offers were not accepted. Penrose, of course, was under no obligation to accept a compromise. A compromise is a purely consensual matter. In any event, the settlement offers came at a time when the debtor was being pursued by Penrose.

The last was an offer to pay Penrose $25,000.00 at a time when the garnishment had already captured $16,000.00. They followed a year in which the debtor had earned $200,000.00 more than he earned the year before and after years of inaction. The debtor's inaction in resolving this debt when he had paid all other creditors and reached a satisfactory agreement with the IRS was not the result of lack of money. It reflects the debtor's clear animus toward Penrose and his desire and efforts to avoid paying him anything.

The failure to accurately schedule the value of the new home and to list all assets on Schedule B affects a chapter 13 plan. A chapter 13 plan must meet the liquidation test. Here, the schedules reflect that creditors would not receive anything if the case had been filed under chapter 7. The schedules are, of course, incorrect and there would be a distribution to creditors in a chapter 7 case. The liquidation test sets one minimum for the amount of payments that must be made in a chapter 13 case. The other minimum is the net disposable income available to fund a plan.

The delay was caused solely by the debtor. It prevented the first meeting of creditors from being completed. The first payment to the trustee was delayed. Consideration of the chapter 13 plan was delayed. Distribution to creditors was delayed. The delay increased the likelihood that the garnished funds would be released to the debtor and used by him for personal obligations and not to satisfy his creditors. The delay increased the expenses of the creditors and the trustee.

The court cannot ignore the nature of the debts scheduled and the prior history of the debtor in bankruptcy. Having filed twice before, once under chapter 7 and once under chapter 13, he is not a novice in the bankruptcy court and is aware of the basic requirements of the court and the

Bankruptcy Code. The failure to make any voluntary payments on a non-dischargeable debt during the past five years (particularly during 2000 when he had the ability to pay it in full), the filing of the petition after a significant amount of income had been subjected to garnishment but not yet paid to the judgment creditor, the absence of any other precipitating event (such as a scheduled foreclosure on the debtor's new home or a tax levy), and the incomplete and inaccurate petition, schedules and Statement of Financial Affairs demonstrate a deliberate attempt by the debtor to delay the payment of his creditors by any means. The delay here was unreasonable and was to the prejudice of the creditors. The case should, therefore, be dismissed pursuant to 11 U.S.C. § 1307(c)(1), unreasonable delay by the debtor that is prejudicial to creditors.

■■■ In determining whether the case should be dismissed with prejudice, the court should consider the debtor's good faith. In a different context, a motion to dismiss a chapter 11 case as a bad faith filing, the finding of bad faith requires a finding of subjective intent and objective futility. *Carolin Corp. v. Miller*, 886 F.2d 693, 700–01 (4th Cir.1989). Those principles can be applied to this case as well. Here, the bad faith is clear from the debtor's repeated conduct and the totality of the circumstances. No chapter 13 plan can be confirmed. The debtor has no assets to liquidate that would substantially fund a plan. Nor does he have sufficient income to propose even a minimal plan. The filing is prejudicial principally to Penrose who could lose the single largest payment on his judgment. The petition in this case follows a pattern—prior bankruptcy filings to defeat Penrose's collection actions, manipulation of tax withholdings to minimize the amount seized under a garnishment, payment of all other credi-

tors without any voluntary payment to Penrose—specifically designed to hinder and delay Penrose in recovering his judgment. The debtor's sole motivation in filing the present petition was to further stymie Penrose and prevent him from recovering $16,000 under the garnishment. The debtor has no other immediate need for bankruptcy relief. Except for his 2000 federal tax liability, he has no other creditor problems. Considering the totality of the circumstances, the debtor's objective bad faith and the objective futility of obtaining confirmation and completion of a successful chapter 13 plan, it is clear that the debtor filed the case in bad faith and that the delays in the case were an extension and manifestation of his bad faith and his animus toward Penrose. *See In re Green*, 934 F.2d 568 (4th Cir.1991).

Mere dismissal is not an adequate remedy for the pattern of conduct that includes the filing of this case. The debtor sought to use the Bankruptcy Code as one of several tools to frustrate Penrose's attempts to realize on his judgment. He sought to gain an advantage against a single creditor. *See In re Kestell*, 99 F.3d 146, 147 (4th Cir.1996). *See also Atlas Mach. & Iron Works, Inc. v. Bethlehem Steel Corp. (In re Atlas Mach. & Iron Works, Inc.)*, 986 F.2d 709, 716 (4th Cir. 1993); *In re Caucus Distribs., Inc.*, 106 B.R. 890, 924 (Bankr.E.D.Va.1989). Such abuse undermines the integrity of the bankruptcy system. *Kestell*, 99 F.3d at 149. Accordingly, the appropriate remedy is to dismiss the case with prejudice to the debtor filing a petition in any bankruptcy court under any chapter for a period of one year after the dismissal of this case. The one-year period selected balances the debtor's right to seek future bankruptcy relief with the need to prevent manipulation of the bankruptcy system. *Neufeld v. Freeman*, 794 F.2d 149, 153 (4th Cir. 1986) (Consideration of the non-discharge-

able nature of a claim in plan confirmation "ensures against manipulation of the statute by debtors who default on [non-dischargeable obligations] and who subsequently seek refuge in Chapter 13 in order to avoid, at minimal cost, a nondischargeable debt."). The one-year period provides a reasonable time for the creditor to pursue his remedies without forever precluding the debtor from returning to the bankruptcy court for relief, if necessary. The mere passage of time, however, is not necessarily sufficient to assure that a future filing is made in good faith.